STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

04-293

CAROLYN DAUZAT MARCOTTE

VERSUS

THOMAS ERNEST MARCOTTE

**************
APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NUMBER 2003-4798-B
HONORABLE WILLIAM J. BENNETT, DISTRICT JUDGE

**************
**ELIZABETH A. PICKETT**
**JUDGE**
**************


Court composed of Sylvia R. Cooks, Marc T. Amy, Glenn B. Gremillion, Elizabeth A. Pickett and Billy H. Ezell, Judges.

Cooks, J., dissents

REVERSED AND REMANDED.

Anthony Salario
Attorney at Law
P.O. Box 503
Marksville, Louisiana 71351
(318) 240-7123
Counsel for Plaintiff/Appellee:
Carolyn Dauzat Marcotte

Angelo J. Piazza, III
Attorney at Law
P.O. Box 429
Marksville, Louisiana 71351
(318) 253-6423
Counsel for Defendant/Appellant:
Thomas Ernest Marcotte

**PICKETT, Judge.**

The sole issue on appeal is whether the trial court erred in finding that Carolyn Marcotte met her burden of proof in her petition for divorce based on adultery. For the following reasons, we reverse the judgment of the trial court granting Mrs. Marcotte a divorce based on adultery.

## FACTS

Carolyn Dauzat Marcotte and Thomas Ernest Marcotte were married on August 27, 1982. The Marcottes reside in Marksville, Louisiana. The couple were good friends of Marksville residents Terrill and Laura St. Romain. On April 8, 2003, Terrill St. Romain informed Mrs. Marcotte that he suspected his wife, Laura St. Romain, and Mr. Marcotte were having an affair. When Mr. Marcotte returned home that day, Mrs. Marcotte confronted him about the alleged affair. After the confrontation, Mr. Marcotte left the family home and went to stay with his sister. On April 11, 2003, Mrs. Marcotte filed a Petition for Divorce wherein she alleged that her husband had committed adultery.

A trial on the merits was held on November 17, 2003. After hearing testimony from both parties, and Mr. and Mrs. St. Romain, the trial court issued oral reasons for judgment. The trial court found that Thomas Marcotte and Laura St. Romain were having an adulterous relationship and granted Carolyn Marcotte a judgment of divorce on the grounds of adultery.

It is from this judgment that the defendant appeals.

## LAW AND DISCUSSION

It is well-settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." *Rosell v. ESCO*, 549 So.2d 840 (La.1989).

Louisiana Civil Code Article 103(2) provides that a petitioner shall be granted a divorce upon *proof* that the other spouse has committed adultery. (emphasis added.) By definition, adultery is a "violation of the marriage bed; sexual intercourse between a married man and a woman not his wife, or between a married woman and a man not her husband." *State v. Jack*, 596 So.2d 323, 326 (La.App. 3 Cir.), *writ denied*, 600 So.2d 611 (La.1992) (*citing* Webster's New Universal Unabridged Dictionary 27 (2nd ed. 1979)). Jurisprudence mandates that the one alleging adultery has the burden of proof. Furthermore, "[t]he facts and circumstances must be such as to lead fairly and necessarily to the conclusion that adultery has been committed as alleged in the petition, i.e., the proof must be so convincing as to exclude any other reasonable hypothesis but that of guilt of adultery." *Lewis v. Lewis*, 446 So.2d 995, 997 (La.App. 3 Cir. 1984), *citing Helms v. Helms*, 349 So.2d 441 (La.App. 3 Cir. 1977). The Louisiana Supreme Court noted in *Hermes v. Hermes*, 287 So.2d 789 (La.1973), the mere fact that a man and woman are alone together does not necessarily create a presumption that adultery was committed.

At the trial of this matter, Mr. St. Romain testified concerning the circumstances surrounding his divorce from his wife:

Q. What were the reasons for the divorce?

A. Adultery.

. . . .

Q. What circumstances gave rise to the separation?

A. Telephone calls, she'd tell me that she's in places where she wasn't, suspicion, and then I confronted her.

Q. And what do you mean by that; how did you confront her?

A. I asked her if she was having an affair behind my back and

she responded with what if I am and then I asked if it was with Thomas Marcotte and she said so what if it is.

Q. What gave you an indication that it could be with Thomas Marcotte?

A. Just him coming very much to the house and even if I wasn't there he'd show up.

. . . .

Q. And why would he come by your house other than for work; would he ever come by other than for doing the carpentry work?

A. No, he'd come to visit. We had grew as friends and we fished together and hunt together.

Q. Was he ever at your house, [t]o your knowledge, when you weren't there?

A. I called several times, yes, he was there.

. . . .

Q. Did you ever discover any other evidence that maybe an affair was going on between Thomas [Marcotte] and your wife?

A. Yes, sir, the phone calls; the phone bills.

Q. What I've marked as "Carolyn Marcotte Number 2" could you explain to the Court what that is?

A. Yes, all those highlighted are Mr. Marcotte's either cell phone or beeper number and the 0066s which is I don't, I haven't counted all of them, but probably twice that month I called her. There's about twenty times that someone else called her.

Q. And how did you verify the number?

A. He had given me a card prior to building the porch, so I had this cell phone and work phone.

On cross-examination, Mr. St. Romain testified as follows:

Q. Just a couple of hours ago, as you pointed out, your divorce

3

was obtained and it was obtained, was it not, on a six month separate and apart basis?

A.    Well, it was agreed on , but there was some discrepancies in that, yes, sir.

A.    Back in August in order . . . she called and said in order not to slander her name and bring my son in court, it I would agree on just doing a six month divorce and I agreed if she would show me some kind of paper saying that she had committed adultery and when she said yes she'd agree, I agreed, but yet I have yet to have my paper.

Q.    So as we sit here she never has to this point, admitted to it, right?

A.    No, sir.

BY THE COURT:

Q.    When did it become obvious that they were together out in the open that they were seeing each other?

A.    The night I went to confront Mr. Marcotte, he wasn't home, his wife was, so I talked to her and then I left from her house.  I went back to my house, but my wife had already left.  The following day she came back.  She had a hickey on her neck and I confronted her with who had done it and she says don't worry who did it.  She says any man can suck on my neck and it's her business.  And I asked her if it was Mr. Marcotte and she said so what if it is.

The plaintiff, Carolyn Marcotte, testified at the trial of this matter as follows:

Q.    And how did you become suspicious or have reason to think that he was committing adultery?

A.    He would get telephone calls and when he'd get telephone calls he'd immediately leave.  It didn't matter if lights were on, if there was anything he left going in the back, he'd just take off and run like he lost his senses.  This would happen around four, 4:15, 4:30 in the afternoons, sometimes later.  There was times he said he was going to work that they had paged him to go to work because (UNINTELLIGIBLE).

Q.    Did you ever obtain any information to confirm that he was having an affair on you and who with?

4

A. On telephone calls I've picked up that him a woman's [voice] talking and . . . on the phone and then they would stop and then immediately the next day after we were separated Laura St. Romain was on the phone and she started telling me I'm sorry Carolyn[,] I'm sorry. And I said for what Laura destroying my life. And she just wouldn't [say] anything any more.

. . . .

Q. Do you recall when those photographs were taken, approximately, was it after April when y'all separated?

A. It was after April. It was . . . I don't remember the exact date.

. . . .

Q. Let's talk about the photographs. And then what did you do?

A. So in order to prove that there was something going on I just left one night and I did not know where this camp ronde vou [sic], where the camp was in Spring Bayou. I had a general idea. And when I got to this bridge some lights came on just like when kids go parking, the lights came on and then they were turned off on a vehicle. And I just pulled right up to the gate and there they were on this photo, together.

. . . .

Q. Do you have any . . . did you ever obtain any other information either documentation or any physical signs that he was having an affair?

A. I never went . . . actually witnessed them in the action . . . .

On cross-examination, Mrs. Marcotte testified as follows:

Q. Mrs. Marcotte, you are aware that Tom did some work for the St. Romain's at their home?

A. Yes.

Q. And as you say when you picked up the phone Mrs. St. Romain was talking to him about moving and hauling

5

branches at the camp?

. . . .

Q.   Both of these people had their clothes on at that time immediately, did they not?

A.   Of course, in the pictures.  I don't know what transpired before.  This is on the journey out from the camp.  He was unlocking the chain.

BY THE COURT:

Q.   Oh, okay.  But I mean do you have anything to indicate that they were having sex?

A.   No.

BY MR. PIAZZA:

Q.   So, basically, it's . . . you have no hard core direct evidence that they've ever had sex; they've both denied it, is that right?

A.   I don't know what Laura denied or what she said was true.

Q.   Tom's denied it, hasn't he?

A.   Yes.  And then, yes, he's denied it.

BY THE COURT:

Q.   Mrs. Marcotte, do you have any evidence to indicate to me before April 11th, 2003 that Thomas Marcotte and Laura St. Romain were having sexual relations?

A.   No, sir.

Q.   These pictures came about after you filed for divorce?

A.   Yes, sir, it was after, but the phone calls, the paper, the phone calls are stemmed [sic] in March and the beginning of April before April the 8th, the phone calls were going on.

At the close of Plaintiff's case, defense counsel moved for an involuntary dismissal of the divorce action based on adultery.

BY THE COURT:

> Well, there has to be enough . . . there has to be enough evidence to convince the reasonable trier of fact that this . . . that adultery was being committed. That there was some type of physical relationship, not just the phone calls certainly show that they were having some telephone contact, but phone calls[,] I don't think you can have sex using telephone calls. That's not adultery. It is fuel for the fire to indicate adultery, but we don't even have anybody putting them together alone before April 11th, 2003.

Nonetheless, the trial court decided to hear the rest of the case before making a ruling. Mr. Marcotte testified at the trial of this matter as follows:

> Q. Prior to the filing of any proceedings, in your case, have you ever engaged in any sexual conduct of any nature with Laura St. Romain?
>
> A. I have not.
>
> . . . .
>
> Q. You want to explain these pictures out at the camp at twelve thirty at night for the [j]udge?
>
> . . . .
>
> A. I was, at that time, Carolyn and I were separated. Laura had offered me to stay at the camp to rent and we was out there . . . I was out there doing some plumbing work, she had leaks, she had mice in there. I was closing up the holes underneath the camp and she would cook something to eat and we w[ere] on our way back.
>
> Q. Did you have sex that evening?
>
> A. We did not.
>
> Q. It's your testimony that you have not engaged in any sexual intercourse with her?
>
> A. I have not.

On cross-examination, Mr. Marcotte testified as follows:

> Q. Now, did you engage in any type of sex, not necessarily with intercourse with her before your marriage or before

7

your separation?

A.    None whatsoever.

Q.    You heard the testimony from Mr. St. Romain about her having some hickeys on her neck before they separated?

A.    Yes, sir.

Q.    You didn't do that?

A.    I did not.

Q.    Do you dispute that you were making those telephone calls to her?

A.    I do not.  I don't dispute that.

Q.    And who were you calling?

A.    I'd call Terrel [sic] sometimes we'd go fishing.  I'd have fishing trips lined up and the only time that I went to his house that he wasn't there I was supposed to met [sic] him at his house and he was late for work, late coming back from work.

Q.    Did you hear his testimony that those calls weren't to him?

A.    Some of them were, some of them weren't.

Q.    So why would you need to call his wife if you had already stopped working for them?

A.    We were friends.  We'd talk.

Q.    No, I'm talking about did you and Laura ever go anywhere together alone prior to either your separation or her separation?

A.    No, sir.

. . . .

Q.    Do you deny that you were at the camp with her that night?

A.    I don't deny that.

BY THE COURT:

8

Q. Were you in love with Laura St. Romain?

A. We're real good friends.

Q. But still since April y'all haven't had sex?

A. Never have.

Laura St. Romain testified at the trial of this matter as follows:

Q. What was your relationship with Thomas Marcotte at that time?

A. Friends.

. . . .

Q. Had y'all ever done anything together?

A. No.

. . . .

Q. Did y'all have any type of sexual relationship prior to you leaving your house?

A. No, I did not.

Q. What is your relationship since the point that you left the house with Thomas Marcotte?

A. We're still friends, very good friends.

. . . .

Q. Do y'all have any type of sexual relationship now?

A. No, we do not.

Q. There was some testimony from Terrel [sic] that prior to you leaving the house you came home and had some hickeys or something on your neck?

A. That's what he thought they were. And that's who he thought gave them to me as well.

Q. Well, what were they?

9

A.	Allergy reactions.

. . . .

Q.	And why were y'all out there on that day?

A.	I asked him to come and check out a stove that didn't work, that I couldn't get to work because I thought I'd probably be moving there.

. . . .

Q.	At anytime did you offer that Thomas could live at the camp after you separated?

A.	We had maybe talked about it if he needed a place to go.

Q.	Did you ask him to do any work out there?

A.	Yes, I did.

Q.	And what was the work going to be?

A.	It was going to be cleaning up around there and plumbing, whatever I needed done that I couldn't handle.

. . . .

Q.	Well, were you having an affair?

A.	No, I was not.

Q.	Well, why didn't you just say no?

A.	Because he had already accused me on occasion, another occasion of having an affair with someone who lived in Iowa and I was tired of being accused and I didn't think it needed justification.

BY THE COURT:

Q.	Why are you afraid to admit that y'all are in a relationship now other than just friends?

A.	I'm not afraid to admit anything.  I'm not doing it.

Q.	You're not?

10

A.    No, sir.

At the close of testimony, the trial court stated the following:

> The cause in the law for adultery and the standard in the law is more probable than not. What more probable than not happened between these two individuals, Mr. Marcotte and Mrs. St. Romain prior to April 11ᵗʰ, 2003. In the initial presentation of the case by Mrs. Marcotte, there certainly was only enough evidence to indicate they might be having a relationship. However, Mr. Marcotte, then got up on the stand and began to testify and then Mrs. St. Romain testifies and low and behold their stories don't match. They tried to get them to match. They match about one thing. That they weren't having sex. They didn't match about anything else.
>
> Mr. Marcotte said he was working on the camp the night of the pictures because he was moving into the camp. Mrs. St. Romain said she was moving into the camp, so does that mean that they were moving in together or does that mean that they were mistaken as to getting their stories straight. First of all, after they filed for a divorce they can commit all . . . they can have all the sex they want. They can be sleeping with . . . had Mr. Marcotte come her today and said oh, I left Carolyn and I been having a relationship with Laura and we're in love and all this kind of stuff. Okay. Then I'd have good reason to believe that before April 11ᵗʰ, 2003 they were only in the talking stage and it didn't progress until both of the marriages disintegrated. But once they got up here and told different stories then that stuff gets thrown out the window and then I look at circumstantial evidence as Judge Piazza said has every reasonable hypothesis been excluded to indicate that more probable than not Thomas Marcotte and Laura St. Romain were involved in a physical relationship prior to April 11ᵗʰ, 2003 and the answer is a resounding, yes.
>
> I mean my goodness if it was not they'd be today admitting what was going on and everything would be fine and dandy and this case would have been over twenty minutes ago. That's the finding of the court.
>
> The Judgment of Divorce on the grounds of adultery is granted and that takes care of that issue now.

Initially, the trial court found the plaintiff did not present evidence of adultery.

That evidence consisted of testimony from Mrs. Marcotte and Mr. St. Romain

concerning phone calls, an alleged hickey on Mrs. St. Romain's neck, photographs

of the two of them alone at a camp taken *after* Mrs. Marcotte filed for divorce, Mr.

11

Marcotte being at Mr. St. Romain's home when he was not present and Mrs. St. Romain not being where she told her husband that she would be. The trial court, however, denied defense counsel's Motion for an Involuntary Dismissal and proceeded with the hearing. At that time, Mr. Marcotte and Mrs. St. Romain testified. Both denied the allegations that they were having a sexual relationship before and after being separated from their spouses. After the close of the trial, the trial court then ruled in favor of Mrs. Marcotte, granting her a divorce on the grounds of adultery. The trial court granted the judgment of divorce based on the fact that Mr. Marcotte's and Mrs. St. Romain's testimony about what they were doing at the camp the night Mrs. Marcotte took the photographs of them "did not match."

> Although adultery may be established by indirect or circumstantial evidence as well as by direct evidence, the rule as stated by the court in *Hayes v. Hayes*, 73 So.2d 179 (La.1954), is that "the circumstantial proof in these cases must be so convincing as to exclude any other reasonable hypothesis but that of guilt." *Fister v. Fister*, 131 So.2d 103 (La.App. 3 Cir. 1961). The facts and circumstances must lead fairly and necessarily to the conclusion that adultery has been committed as alleged in the petition. In other words, the circumstantial proof in these cases must be so convincing that it establishes the guilt of the party accused to the exclusion of any other reasonable hypothesis.

*Id.* at 180.

Apparently the circumstantial proof presented in plaintiff's initial case did not convince the trial court that Mr. Marcotte was guilty of adultery. However, Mr. Marcotte's and Mrs. St. Romain's testimony concerning why they were at the camp caused the trial court to change its mind. Upon reviewing their trial testimony, we find that Mr. Marcotte testified he was at the camp doing some plumbing work and that they did not engage in sex that night. In addition, Mr. Marcotte testified that Mrs. St. Romain offered to let him stay at the camp to rent. We note that Mrs. St. Romain testified that she and Mr. Marcotte were not having an affair, that they did

not have sex at the camp and that Mr. Marcotte was there to do some cleaning up and plumbing. In addition, Mrs. St. Romain also testified that she and Mr. Marcotte had talked about him staying at the camp if he needed a place to go.

We must presume that the trial court found Mr. Marcotte guilty of adultery because it did not find his and Mrs. St. Romain's testimony to be credible.

Adultery is a serious allegation and often difficult to prove due to lack of direct evidence. Therefore, the complaining spouse may prove an adulterous relationship by circumstantial evidence. However, in those cases where the spouse seeks to prove adultery solely using circumstantial evidence, there is a heightened burden of proof. The evidence must be so convincing as to exclude any other reasonable hypothesis but that of guilt of adultery. Therefore, even if Mr. Marcotte's and Mrs. St. Romain's camp testimonies did not match, and we find they do not truly conflict, conflicting testimony falls short of establishing adultery to the exclusion of any other reasonable hypothesis. Furthermore, the burden of proof is not satisfied merely by evidence that a man and woman were alone together or that the accused had the opportunity to commit adultery. *Lacheny v. Lachney*, 579 So.2d 1097 (La.App. 2 Cir. 1991). The accused spouse's innocence of immoral acts is presumed. *Fister*, 131 So.2d 103. In the instant case, there was no evidence presented that the accused had a sexual relationship with Mrs. St. Romain.

## DECREE

The trial court clearly stated that there was only enough evidence to indicate they might be having a relationship. That evidence, coupled with conflicting testimony, is not sufficient to prove a prima facie case of adultery. We, therefore, find that there is no evidence in the record that supports a judgment of divorce on the

13

grounds of adultery. The judgment of the trial court granting Mrs. Marcotte a judgment on the grounds of adultery is clearly wrong. Accordingly, the judgment of the trial court is reversed and the matter is remanded to the trial court. The costs of this appeal are to be borne by the plaintiff-appellee, Mrs. Marcotte.

**REVERSED AND REMANDED.**

# STATE OF LOUISIANA

# COURT OF APPEAL, THIRD CIRCUIT

# 04-293

**CAROLYN DAUZAT MARCOTTE**

**VERSUS**

**THOMAS ERNEST MARCOTTE**

**COOKS, J. dissents.**

I respectfully dissent from the majority opinion and agree with the finding of the trial court, who stated:

> Mr. Marcotte, then got up on the stand and began to testify and then Mrs. St. Romain testifies and low and behold their stories don't match. They tried to get them to match. They match about one thing. That they weren't having sex. They didn't match about anything else.
> Mr. Marcotte said he was working on the camp the night of the pictures because he was moving into the camp. Mrs. St. Romain said she was moving into the camp, so does that mean that they were moving in together or does that mean that they were mistaken as to getting their stories straight. . . . But once they got up here and told different stories . . . then I look at circumstantial evidence as Judge Piazza said has every reasonable hypothesis been excluded to indicate that more probable than not Thomas Marcotte and Laura St. Romain were involved in a physical relationship prior to April 11th, 2003 and the answer in a resounding, yes. I mean my goodness if it was not they'd be today admitting what was going on and everything would be fine and dandy and this case would have been over twenty minutes ago. That's the finding of the court.

When proving adultery, the court, in *Breaux v. Breaux*, 323 So.2d 486 (La.App. 1 Cir. 1975), stated:

> Circumstantial proof of adultery requires production of indirect or circumstantial evidence, which fairly and necessarily justifies and supports the conclusions that adultery was committed. The degree of proof of adultery by circumstantial evidence is similar to proof of guilt in a criminal proceeding and in that the evidence must establish guilt of the party accused to the exclusion of any other reasonable hypothesis.

*Id.* at 488.

The telephone records produced at trial document numerous telephone calls

between Mr. Marcotte and Mrs. St. Romain during the months prior to the separation and filing for divorce. Additionally, Mr. St. Romain testified Mrs. St. Romain came home one day with a "hickey" on her neck. He testified as follows:

> She had a hickey on her neck and I confronted her with who had done it and she says don't worry who did it. She says any man can suck on my neck and it's her business. And I asked her if it was Mr. Marcotte and she said so what if it is.

Mrs. Marcotte testified she photographed her husband and Mrs. St. Romain in her husband's truck parked at Mrs. St. Romain's camp about midnight one night. Although this incident occurred after the April divorce filing, Mr. Marcotte and Mrs. St. Romain told conflicting stories about the circumstances surrounding their presence at the camp at midnight. Additionally, Mrs. Marcotte testified while her husband was still living at home, a woman would call their home and her husband would "just take off and run like he lost his senses. This would happen around four, 4:15, 4:30 in the afternoon, sometimes later."

Mr. Marcotte testified at trial and denied causing the hickey on Mrs. St. Romain's neck. He denied having a sexual relationship with Mrs. St. Romain even after his divorce and insisted he and Laura are "just friends." When questioned about the night at the camp, he testified:

> I was, at that time, Carolyn and I were separated. Laura had offered me to stay at the camp to rent and we was out there . . . I was out there doing some plumbing work, she had leaks, she had mice in there. I was closing up the holes underneath the camp and she would cook something to eat and we was on our way back.

Mrs. St. Romain testified she and Mr. Marcotte are "very good friends" and they speak daily on the telephone. She denied having a sexual relationship with him before or after her divorce. When questioned about the night at the camp, her story differed from Mr. Marcotte's. She testified:

> I asked him [Mr. Marcotte] to come and check out a stove that

2

didn't work, that I couldn't get to work because I thought I'd probably be moving there . . . . I don't think it was that time. I think it was about eleven o'clock at night. That we went and we built a campfire, we cooked out there.

I would find the circumstantial evidence (i.e., the numerous telephone calls, the "hickey" on Mrs. St. Romain's neck, the presence at the camp after midnight, the conflicting testimony between the parties, the unbelievable denial of a sexual relationship even after the divorce) "fairly and necessarily justifies and supports the conclusions that adultery was committed." *Breaux v. Breaux*, 323 So.2d at 488. Therefore, I respectfully dissent from the majority opinion.